IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| GCPE ARES BUYER, INC. | | PLAINTIFF |
| v. | Case No. 1:19-cv-01469 | |
| JOSE J. ARMAS, M.D. and ARMOR CORRECTIONAL HEALTH SERVICES, INC. | | DEFENDANTS |
| ARMOR CORRECTIONAL HEALTH SERVICES, INC.; JOSE J. ARMAS, M.D.; and ARMOR MANAGEMENT SERVICES, LLC | | COUNTER-PLAINTIFFS |
| v. | | |
| GCPE, INC. and ARES BUYER, INC. | | COUNTER-DEFENDANTS |

**MEMORANDUM OPINION**

Before the Court is the motion for summary judgment filed by Plaintiff GCPE Ares Buyer, Inc. (ECF No. 66) and the motion for summary judgment filed by Defendants/Counter-Plaintiffs Armor Correctional Health Services, Inc., Jose J. Armas, M.D., and Armor Management Services, LLC ("Defendants") (ECF No. 67). This matter has been briefed and is ready for consideration. (ECF Nos. 68, 71, 72, 74, 75).[1]

**I.  Background**

    **A.  Procedural Background**

On August 6, 2019, Plaintiff filed a complaint against Defendants Jose J. Armas, M.D. and Armor Correctional Health Services, Inc. (ECF No. 1). On August 20, 2019, Plaintiff filed a first amended complaint for breach of contract, tortious interference with existing contracts and potential business relations, unjust enrichment, and for the attorney fees and costs associated with this present action. (ECF

---

[1] The Court finds that oral argument is unnecessary. (ECF No. 76).

1

No. 3).  On September 18, 2019, Defendants filed an answer and counterclaims to the amended complaint against Plaintiff and a third-party complaint against Alexander "AJ" Johnson ("A. Johnson") and Fitz Johnson ("F. Johnson") (collectively "Third-party Defendants").  (ECF No. 7).  Defendants' complaint alleges that the Plaintiff and the Third-party Defendants committed fraud, breached their fiduciary duties, breached the parties' contract, and were unjustly enriched.  *Id.*  On October 9, 2019, Plaintiff filed an answer.  (ECF No. 9).  On December 13, 2021, Plaintiff filed a motion to dismiss the Third-party Defendants.  (ECF No. 47).  On March 23, 2022, the Court granted Plaintiff's motion and dismissed the claims against the Third-party Defendants without prejudice.  (ECF No. 65).

      **B.**    **Factual Background**

Armor is a correctional healthcare company that contracts with counties and states to provide healthcare in jails and prisons throughout the country.  (ECF No. 7 ¶ 11).  Since its inception in 2004, Dr. Armas, a licensed physician, has been Armor's sole owner.  (*Id.* ¶ 12).  In late 2017, Dr. Armas began to explore the possibility of selling all or a portion of Armor to a third-party.  (*Id.* ¶ 13).  During that process, A. Johnson showed interest in acquiring some or all of Armor and met with Dr. Armas to discuss the opportunity.  *Id.*  Although A. Johnson had some experience with government healthcare contracts, he had never worked in the correctional industry.  (A. Johnson Dep. 11:7–20, ECF No. 68-1 at 12).  After some initial discussions, the parties negotiated letters of intent and eventually agreed that an entity affiliated with A. Johnson would acquire what would amount to 70% of Dr. Armas's interest in Armor.  (*Id.* at 141–49).

Prior to the finalization of the Purchase Agreement, the parties engaged in due diligence. Throughout the due diligence process, A. Johnson and what became the buyer entity, the Plaintiff, were represented by the law firm Greenberg Traurig as well as Mazzone & Associates, an investment bank.  (A. Johnson Dep. 17:10–21; 23:16–18, *Id.* at 18).  As a part of the due diligence, Armor opened a data room that was populated by Armor employees and Armor's counsel.  (*Id.* at 154–56).  The data room contained hundreds of documents relating to Armor's business.  (ECF No. 68-2 ¶ 3).  Plaintiff's diligence team had access to the data room.  A. Johnson had access to the data room, although at his deposition he could not recall whether he reviewed any material in the data room and could not testify as to what was in it.  (A.

Johnson Dep. 31:2–8, ECF No. 68-1 at 32). The parties worked together during the due diligence process, and the Armor team regularly fielded questions from the Plaintiff's team regarding all aspects of the Armor business. (ECF No. 68-2 ¶ 4). As part of the due diligence process, A. Johnson spent time at Armor's headquarters reviewing the company's finances and getting to know the business. (Bertran Dep. 26:5–18, ECF No. 68-1 at 173).

The parties also worked together regarding disclosure schedules that would be incorporated into the Purchase Agreement. Stuart Sanford from Mazzone & Associates was authorized to receive disclosures schedules produced by Armor and to coordinate with the Armor team regarding any additional disclosure-related administrative needs. (A. Johnson Dep. 28:12 – 29:6, *Id.* at 30). Sanford was given information regarding Armor's business, including a comprehensive list of all active insurance policies. (*Id.* at 176–86).

On May 31, 2018, the parties executed the Purchase Agreement (*Id.* at 187–291). Pursuant to the terms of the Purchase Agreement, the total purchase price was divided into two categories: (1) the "Cash Purchase Price" of $975,000, and (2) the non-cash purchase price of $4,355,000, which was to be held in a note that Plaintiff would pay to Dr. Armas over time. (*Id.* at 218); (*see* A. Johnson Dep. 50:6–9, 53:24 – 54:8, *id.* at 51, 53–54).

The Purchase Agreement also provided for a delayed transfer of the equity from Dr. Armas to Plaintiff. Specifically, because of corporate practice of medicine ("CPOM") regulations, it was Plaintiff's decision that Dr. Armas would retain ownership of Armor for a certain period post-closing until Plaintiff designated a "Buyer Designee" with the appropriate medical licensure to take ownership of Armor's stock. (*Id.* at 283–89). Plaintiff was to run the business immediately post-closing, but the equity would not transfer to Plaintiff until a Buyer Designee had been named. (A. Johnson Dep. 62:13–20, *Id.* at 63). Plaintiff was to designate the Buyer Designee by December 15, 2018 before incurring liquidated damages penalties of $2,500.00 per day for each day that the transfer did not take place. (*Id.* at 287–88). The parties also agreed that if Plaintiff failed to designate a Buyer Designee by December 15, 2018, then all obligations between the parties would cease immediately and Dr. Armas would have the right to effectively cancel the

transaction and resume operation of the business. (*Id.* at 288–89). Section 10.20(f) of the Purchase Agreement states:

> In the event that the Deferred Transfer(s) shall not have occurred on or before December 15, 2018, then all obligations of Buyer and its Affiliates and Seller and each of the other Armor Parties hereunder shall cease immediately thereupon, and as of such date, Seller, in its sole discretion, shall have the right to either (i) commence the winding down of the Deferred Transfer Business (the "Local Wind Down") in a manner that Seller deems reasonable (including, at Seller's election, the termination of any or all Contracts between the Company and any Armor Practice Entity existing at such time), and all costs incurred by Seller or any other Armor Party to the extent arising out of, related to or otherwise incurred in connection with, such Local Wind Down shall be borne and/or reimbursed by Buyer, or (ii) continue to operate the Deferred Transfer Business and/or sell, convey, assign and transfer the Deferred Transfer Business or any of the Deferred Transfer Items (such sale, conveyance, or transfer a "Alternative Deferred Transfer") to a third-party Person (a "Third Party Designee") selected by Seller in its sole discretion.

*Id.* A. Johnson and Plaintiff understood that Armor needed the Buyer Designee to be in place before the end of 2018. (A. Johnson Dep. 91:4 – 92:7, *Id.* at 92–93).

The parties also executed a Restructuring and Cooperation Agreement ("Cooperation Agreement") which outlined the parties' plan and commitment to cooperate with a restructuring of Armor's corporate organization and business operations to be in line with CPOM standards. (*Id.* at 292–318). Specifically, the Cooperation Agreement was designed to ensure that post-closing, when A. Johnson and F. Johnson would be running the Armor business but before Plaintiff would actually take possession of the equity, Dr. Armas and his affiliates would be obliged to cooperate in steps necessary to ensure compliance with regulations around the CPOM. (ECF No. 68-2 ¶ 6). The purpose of the Restructuring contemplated by and defined in the Cooperation Agreement was to separate the management of the business from the medical and dental operations. (ECF No. 68-1 at 316). As Plaintiff alleges in its First Amended Complaint:

> [T]o satisfy regulatory requirements, the parties agreed to a plan to reorganize the Company by separating Armor Medical's medical services from its management services (the "Armor Reorganization"). The contemplated Armor Reorganization would create a separate entity controlled by a "friendly physician" to provide the medical services. That entity would then enter into a management services contract with a Georgetown-controlled entity.

(ECF No. 3 ¶ 16).

4

As contemplated by the Purchase Agreement, Plaintiff took over Armor's operations immediately post-closing. (ECF No. 68-2 ¶ 7). After taking control of Armor, A. Johnson and F. Johnson had full operational control of the company, including access to all Armor accounts, information, and personnel. *Id.* At his deposition, A. Johnson could not recall what his title was at Armor—possibly CEO or president. (A. Johnson Dep. 108:20–25, ECF No. 68-1 at 109). However, he did recall that he focused on strategic business decisions and his brother, F. Johnson, focused on the operational aspect of the business. (A. Johnson Dep. 62:17–20, *Id.* at 63). F. Johnson testified that he focused on learning Armor's business operations, customer base, and staff, and he focused on ways to promote Armor's efficiency and profitability. (F. Johnson Dep. 25:17 – 26:2, 27:3–12, *Id.* at 327–29).

Despite having full control over Armor operations and a contractual obligation to do so, Plaintiff did not designate a Buyer Designee by the parties' agreed deadline. Shortly before the deadline, Dr. Armas agreed to extend the deadline by a couple of days, and the parties entered into an amendment to the Purchase Agreement to that effect. (*Id.* at 330–35). However, Plaintiff did not timely appoint a Buyer Designee. After Plaintiff missed the extended deadline, Dr. Armas sent a letter stating that he was exercising his contractual right to effectively cancel the transaction and to continue to own and operate the business himself. (*Id.* at 347–51).

**II.     Standard of Review**

Under Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). An assertion that a fact cannot be—or, alternatively, is—genuinely disputed must be supported either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible

5

evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).  If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted).  The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating that the party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted).  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

**III.   Discussion**

Both Plaintiff and Defendants argue that they are entitled to summary judgment on Count I of Plaintiff's amended complaint for Breach of Contract.  In addition, Defendants argue that they are entitled to summary judgment on Count III of Plaintiff's amended complaint for unjust enrichment and on Count IV for attorney fees and costs.  Plaintiff conceded that it is not contesting Defendants' Motion with respect to Counts III and IV.  (ECF No. 71 at 4).  Therefore, Defendants' Motion as to those Counts should be granted.  Further, Plaintiff only challenges Defendants' efforts to dismiss the representation and warranties claims concerning adequate insurance coverage.  Defendants make three arguments regarding Plaintiff's representations and warranties claim as follows: (1) Plaintiff failed to establish that Defendants had "Knowledge" of the insurance coverage issues; (2) Plaintiff had to complete its purchase of Armor in order to get damages for Defendants' alleged misrepresentations; and (3) Plaintiff failed to show it suffered an injury.  (ECF No. 68 at 19–22).

6

To state a claim for breach of contract, a plaintiff must establish that a contract existed; the defendant breached an obligation imposed by the contract; and that the defendant's breach damaged the plaintiff. *VLIW Tech., LLC v. Hewlett–Packard Co.,* 840 A.2d 606, 612 (Del. 2003). When the contract is clear and unambiguous, the Court will give effect to the plain meaning of the contract's terms and provisions. *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010). However, if it is possible to reasonably ascribe multiple and different interpretations to a contract, the Court will find that the contract is ambiguous. *Id.* at 1160. "An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract." *Id.* If a contract is ambiguous, the doctrine of *contra proferentem* applies against the drafting party, and the contract is interpreted in favor of the non-drafting party. *Id.* "The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous." *Id.*

Here, the parties disagree primarily on one of the of alleged misrepresentations, specifically, that in Section 4.21 of the Purchase Agreement, Defendants represented that Armor's insurance policies "provide adequate insurance coverage for the assets and the operations . . . and for all risks normally insured against . . ." (ECF No. 68-1 at 244)[2]. Plaintiff alleges that Defendants had knowledge of the insurance

---

[2] 4.21. Insurance; Bonds. (a) Seller has delivered to Buyer true and complete copies of all current policies of insurance to which any Armor Party is a party or under which any Armor Party (or such Armor Party's assets, properties or employees), or any officer or director thereof, is or has been insured in connection with the Business (including all liability and casualty insurance, workers' compensation, errors and omissions and cyber-network policies). No Armor Party has ever been subject to any liability as a self-insurer. (b) All insurance policies described in the preceding sentences of this Section 4.21 are listed on Schedule 4.21(b). All such policies (i) are in full force and effect, (ii) will continue in full force and effect following the consummation of the transactions contemplated by this Agreement, (iii) taken together, to the Knowledge of Seller, provide adequate insurance coverage for the assets and the operations of the Business and for all risks normally insured against by a Person operating a business of similar size and nature to the Business, (iv) are sufficient for compliance with all agreements (including all Material Contracts) to which any Armor Party is a party and (v) may be canceled without penalty. No notice of cancellation or indication of an intention not to renew any insurance policy has been received by Armor Party with respect to any policy listed on Schedule 4.21(b). (c) No event has occurred (including, without limitation, any Armor Party's, or any Armor Practice Owner's, failure to give notice or information or giving inaccurate or erroneous notice or information), which limits or impairs the rights of Armor Party under the insurance policies listed on Schedule 4.21(b).

coverage issues but misrepresented the company's insurance coverage to Plaintiff. The Purchase Agreement contains a definition of "knowledge" that states:

> (a) when used with respect to Seller or any of the other Armor Parties, means the knowledge of Seller, Mr. Teal, and Mr. Palombo or any knowledge that would have been acquired by any such Person upon reasonable inquiry and investigation, and (b) when used with respect to Buyer, means the actual knowledge of any director or officer of Buyer or any knowledge that would have been acquired by any such Person upon reasonable inquiry and investigation.

(*Id.* at 209).

The disclosure schedules of both Armor's outstanding lawsuits and active insurance policies were provided to Plaintiff. (*Id.* at 174–86). A. Johnson testified that he "wouldn't be surprised" if he had seen Schedule 4.21(b), a list of Armor's active insurance policies (A. Johnson Dep. 38:13–23, *id.* at 39), and he admitted that prior to closing he was aware of some potentially underinsured claims (A. Johnson Dep. 41:5–19, 43:19 – 44:8, *Id.* at 41, 44–45). He could not say whether Plaintiff's due diligence team conducted any investigation into Armor's outstanding medical malpractice claims that were later identified as potentially uninsured or underinsured claims. (A. Johnson Dep. 32:24 – 33:5, *Id.* at 33–34). A. Johnson also could not identify any medical malpractice claims that were pending at the time of the closing that were not disclosed to Plaintiff. (A. Johnson Dep. 36:12–18, *Id.* at 37). While these facts may go to the buyer's knowledge, these facts do not show whether Defendants had, or did not have, knowledge as defined by the Purchase Agreement. Therefore, there are genuine disputes of material facts that will need to be resolved by a jury.

Defendants' motion also alleges that Plaintiff had to complete the purchase of the company in order to allege damages. In addition, Defendants argue that Plaintiff has failed to show that it sustained an injury. Based on the record, the Court cannot presently decide this issue. There are genuine disputes of material facts as to whether the Plaintiff suffered any damages as a result of Defendants' alleged misrepresentation. A jury will decide whether the parties' obligations to one another ended after Plaintiff did not appoint a buyer designee and whether Plaintiff suffered any damages as a result of Defendants' alleged misrepresentation.

**IV.     Conclusion**

For the reasons stated above, the Court finds that the Plaintiff's Motion for Summary Judgment (ECF No. 66) should be and hereby is **DENIED,** and the Defendants' Motion for Summary Judgment (ECF No. 67) should be and hereby is **GRANTED IN PART AND DENIED IN PART**.  Counts III and IV of Plaintiff's First Amended Complaint (ECF No. 3) are hereby **DISMISSED WITH PREJUDICE**.

Defendants' Proposed Order (ECF No. 67-1) indicated that the parties have stipulated to dismissal of Count II of the Plaintiff's First Amended Complaint.  However, the parties need to file an appropriate stipulation of dismissal to remove this claim.  A judgment of even date consistent with this opinion shall issue.  This matter remains set for trial on June 13, 2022.  If this case is fully resolved by settlement before the trial date, it must be done in sufficient time to allow the jury to be halted.  Otherwise, costs may be assigned to the parties.

**IT IS SO ORDERED** this 18th day of May 2022.

*/s/Robert T. Dawson*
**ROBERT T. DAWSON**
**SENIOR U.S. DISTRICT JUDGE**